# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

CARMEN LEYBA,

        **Plaintiff,**

v.                                    **CIV. No. 97-1186 JP/RLP**

CITY OF SANTA FE,

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

On July 27, 1999, Defendant filed a Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract (Doc. No. 68). On July 29, 1999, Defendant filed a Motion for Summary Judgment on Plaintiff's Claims for Discrimination (Doc. No. 79) and a Motion for Summary Judgment on Plaintiff's Claims for Retaliation (Doc. No. 83). After carefully reviewing the briefs, the pleadings, and the applicable law, I conclude that Defendant's Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract should be granted; Defendant's Motion for Summary Judgment on Plaintiff's Claims for Discrimination should be denied; and Defendant's Motion for Summary Judgment on Plaintiff's Claims for Retaliation should be granted in part and denied in part.

# I. LEGAL STANDARD

## A. Summary Judgment

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Applied Genetics Int'l., Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party moving for summary judgment bears the burden of "'showing'--that is, pointing out to the district court-- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Id.* "In reviewing the record for genuine issues of material fact, [I] construe the pleadings and documentary evidence liberally in favor of the nonmoving party." *Cole v. Ruidoso Mun. Schools*, 43 F.3d 1373, 1379 (10th Cir. 1994).

## B. Title VII Discrimination

Title VII prohibits an employer from discriminating against an employee on the basis of gender or in retaliation for opposing unlawful employment practices. *See* 42 U.S.C. § 2000e-2(a) and § 2000e-3(a). The central task in a Title VII case is to determine whether the defendant intentionally discriminated against the plaintiff. *E.E.O.C. v. Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996). "A plaintiff may prove intentional discrimination 'either directly by persuading

the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (citation omitted). When there is no evidence of direct discrimination, as in this case,[1] a plaintiff's Title VII claim will be analyzed under the burden-shifting approach of *McDonnell-Douglas Corp. v. Green*, 411 U. S. 792, 802-04 (1973). *See Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1328 (10th Cir. 1999) ("In determining whether to grant summary judgment on a Title VII claim, we apply the burden-shifting framework set forth in *McDonnell Douglas* [ ]."), *petition for cert. filed*, 67 U.S.L.W. 3733, No. 98-18 (May 24, 1999).

Under the *McDonnell Douglas* analysis, a plaintiff must first establish a prima facie case of discrimination. If a plaintiff the accomplishes this task, the employer has the burden of coming forward with a nondiscriminatory explanation for the adverse employment action. Once the employer presents such an explanation, the "plaintiff then assumes the normal burden of any plaintiff to prove his or her case at trial." *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992). At this point in the analysis, "the presumption in plaintiff's favor that arose from the establishment of a prima facie case simply 'drops from the case.'" *Id.* (citation omitted).

To overcome a motion for summary judgment when the plaintiff has successfully set forth a prima facie case and the defendant has offered legitimate nondiscriminatory reasons for the adverse employment action, the "plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." *Morgan v. Hilti, Inc.*,

---

[1] Direct evidence of discrimination includes evidence of an "an existing policy which itself constitutes discrimination," *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990), *cert. denied*, 506 U.S. 907 (1992), or a statute creating age-based distinction in terms of employment. *See E.E.O.C. v. Wyoming Retirement System*, 771 F.2d 1425, 1430 (10th Cir. 1985).

108 F.3d 1319, 1321 (10th Cir. 1997); *see Randle v. City of Aurora*, 69 F.3d 441, 452 n. 17

(10th Cir. 1995) (stating that a "civil rights plaintiff may withstand a motion for summary

judgment and is entitled to present his claim to the fact finder if the plaintiff establishes a prima

facie case and presents evidence that the defendant's proffered nondiscriminatory reason was

pretextual--i.e., unworthy of belief."). Thus, "a plaintiff need *not* demonstrate that discriminatory

reasons motivated the employer's decision" in order to overcome a motion for summary

judgment. *Morgan*, 108 F.3d at 1321 (emphasis added).

A plaintiff may establish pretext by demonstrating "'such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find them unworthy of credence and hence

infer that the employee did not act for the asserted non-discriminatory reasons.'" *Morgan*, 108

F.3d at 1323 (citation omitted). Other "[e]vidence of pretext may include, but is not limited to . .

. prior treatment of plaintiff; the employer's policy and practice regarding minority employment

(including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating

hiring criteria); and the use of subjective criteria." *Simms*, 165 F.3d at 1328. It is also

"conceivable that a plaintiff . . . could be so overwhelmingly better qualified than another

applicant that on this evidence alone a trial court could properly find pretext and intent to

discriminate." *Sanchez v. Phillip Morris Inc.*, 992 F.2d 244, 247 (10th Cir. 1993). However, a

plaintiff's "mere conjecture that their employer's explanation is a pretext for intentional

discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River

Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

In analyzing a claim under the New Mexico Human Rights Act, N.M. STAT. ANN. § 28-1-

7 (Michie 1996), the New Mexico Supreme Court has relied on the *McDonnell Douglas* evidentiary methodology, although the New Mexico Supreme Court has been careful to state that it has not adopted federal law as its own. *See Smith v. FDC Corp.*, 109 N.M. 514, 787 P.2d 433 (1990). Because the New Mexico Supreme Court relies on the *McDonnell Douglas* analysis in analyzing discrimination claims under the New Mexico Human Rights Act, and because there is apparently no significant difference between New Mexico law and federal law regarding the use of the *McDonnell Douglas* analysis for discrimination claims,[2] resolution of Ms. Leyba's discrimination and retaliation claims under federal and state law can be accomplished by using the *McDonnell Douglas* analysis.

## II.    BACKGROUND

The undisputed facts are as follows. In August 1989, the Defendant City of Santa Fe ("the City") employed Plaintiff Carmen Leyba ("Ms. Leyba") as an emergency dispatcher. The City later promoted her to emergency dispatcher supervisor. At some time, Ms. Leyba also served as Acting Communications Manager. In April 1995, Ms. Leyba applied for the position of temporary Communications Center Manager. This position is under the general supervision of the Communications Division Director of the Management Information System (MIS) department, (Job Description, Ex. M to Pl. Resp. to Defendant's Mo. for Summ. J. on Pl. Discrimination Claims.), who at the time was Mr. Salazar. The minimum qualifications for the position included

---

[2] Ms. Leyba's Responses to the City's motions for summary judgment on Ms. Leyba's retaliation and discrimination claims do not even mention the New Mexico Human Rights Act or cite to a single New Mexico case. Therefore, it appears that the Plaintiff agrees with the Defendant that her retaliation claim under the New Mexico Human Rights Act should be analyzed under the *McDonnell Douglas* framework and that there is no appreciable difference between her state and federal claims regarding alleged discrimination and retaliation.

five years of experience in public safety communications with at least two years in a supervisory capacity in public safety communications. (Job Description, Ex. M to Pl. Resp. to Defendant's Mo. for Summ. J. on Pl. Discrimination Claims.) It is undisputed that Ms. Leyba met the minimum qualifications.

The City interviewed the four applicants who applied for the position of temporary Communications Center Manager, including Ms. Leyba and Thomas Williams. Mr. Salazar, who was the manager of the Management Information System (MIS) department and supervised the Communications Center Manager, chose Mr. Williams for the position.

On April 26, 1995, Ms. Leyba wrote a memo to the Liz Gutierrez, the Administrative Services Director, and Victoria Gurule, the Personnel Director. The memo states in relevant part, "[t]his grievance is filed as a result of the promotion of Thomas Williams to Communications Center Manager." Ms. Leyba also claimed that Mr. Williams did not meet the minimum qualifications for Communications Center Manager and that she should have been selected because the interview panel had ranked her second behind Mr. Williams. On the same day, Ms. Victoria Gurule responded in writing to Ms. Leyba's concerns and stated that Mr. Williams qualified for the position because he had four years of experience in air traffic control, which was categorically in the same field as public safety communications; seventeen months of experience as an air traffic control supervisor; two years of experience as an Emergency Dispatcher; and twelve months of experience as an Emergency Dispatcher III.

In July of 1995, Ms. Leyba applied for the permanent position of Communications Center Manager, but Mr. Williams was again selected for the position. On May 5, 1995, Leyba filed an EEOC charge of discrimination based on the City's failure to promote her to Communications

Center Manager.  Ms. Leyba alleged that the City discriminated against her on the basis of her sex and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended.

On June 22, 1995, Ms. Leyba submitted a letter asking to be able to resign her position as supervisor and remain as an emergency dispatcher, but her request was denied.   Ms. Leyba submitted a letter of resignation from her position with the City on October 9, 1995.

In February 1996, September 1996, and November 1996, Ms. Leyba applied to the City for a position as an emergency dispatcher, but the City did not offer her a job.  On December 24, 1996, Ms. Leyba filled a second EEOC charge of discrimination alleging that the City had retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, for filing her first EEOC charge of discrimination.

Ms. Leyba filed suit on August 5, 1997, in state court.  On September 4, 1997, the City removed to federal district court.  In her "First Amended Complaint for Personal Injury" ("Amended Complaint"), Ms. Leyba alleges nine counts against the City: Count I for discrimination under the New Mexico Human Rights Act; Count II for retaliation under the New Mexico Human Rights Act; Count III for discrimination under Title VII; Counts IV and V for retaliation under Title VII; Count VI for breach of contract; Count VII for Breach of Implied Covenants of Good Faith and Fair Dealing; Count VIII for punitive damages; and Count IX for intentional spoliation of evidence.[3]

## III.    DISCUSSION

### A.    Defendant's Motion for Summary Judgment on Plaintiff's Discrimination Claims

---

[3] In an August 4, 1999, Memorandum Opinion and Order, I dismissed Count IX of  Ms. Leyba's Amended Complaint for intentional spoliation of evidence.  (Doc. No. 88.)

Defendant's Motion for Summary Judgment on Plaintiff's Discrimination claims is directed at Count I (discrimination under the New Mexico Human Rights Act) and Count III (discrimination under Title VII) of Ms. Leyba's Amended Complaint. Because the City has not argued that Ms. Leyba failed to put forth a prima facie case of discrimination, and because Ms. Leyba has conceded that the City set forth a legitimate nondiscriminatory reason for not promoting her, the only issue to be decided regarding Defendant's Motion for Summary Judgment on Plaintiff's Discrimination Claims is whether Ms. Leyba has satisfied her burden of demonstrating a genuine issue of material fact regarding pretext. The City contends that it promoted Mr. Williams because he met the minimum job qualifications and had a better interview than Ms. Leyba. To avoid summary judgment Ms. Leyba must show that there is a genuine dispute whether this reason is unworthy of belief. *Morgan*, 108 F.3d at 1321. Ms. Leyba essentially makes three arguments to support her contention that she has met this burden.

First, she argues that she has shown pretext by submitting evidence demonstrating that "Mr. Salazar intentionally would not promote a woman to be the manager." (Resp. at 20.) Second, Ms. Leyba contends that "Mr. Salazar knew that Mr. Williams did not possess the requisite minimum qualifications" for the position, but nevertheless manipulated the hiring process to ensure that Mr. Williams was selected. (Resp. at 22.) Finally, Ms. Leyba argues that she has met her burden by showing she is "overwhelmingly more qualified" than Mr. Williams to be

8

Communications Center Manager.

   1.   *Evidence that Mr. Salazar intentionally would not promote a woman to be the Communications Center Manager*

To support her assertion that the City's proffered reason for hiring Mr. Williams was a mere pretext for Mr. Salazar's discrimination against women, Ms. Leyba cites the deposition testimony of various women--Poncha Barron, Susie Romero, Carol Nettles, Darlene Montoya, and Celia Rael de Garcia--and also contends that no woman has ever served as Communications Center Manager. As discussed in detail below, however, the evidence Ms. Leyba cites does not compel the conclusion that Mr. Salazar's alleged gender bias creates a genuine issue of fact regarding whether the City's proffered reason for hiring Mr. Williams is unworthy of belief.

Ms. Barron's testimony pertains to Mr. Williams and a previous Communications Center Manager, Mike Halpin--not to Mr. Salazar.[4] Ms. Nettles merely testified that she thought men had the leadership roles in this country; that it was difficult "for women to get ahead in this city" and that, based on her "vague perceptions," she thought there was a glass ceiling for women in the Dispatch Unit due in part to the Hispanic culture. (Nettles Depo., Pl. Ex. Q at 19-22.) Darlene Montoya testified that the senior emergency dispatchers

---

[4] Ms. Barron's testimony is as follows:

Q.    Did you ever discuss Mr. Williams and your problems with him with Ms. Gutierrez?

A.    I think I talked to Liz Gutierrez about Mike Halpin.

Q.    Did she help at all?

A.    No. She told me that the men that I'm working under at that time when I talked to her don't like to see women advance and for me in other words, just keep my mouth shut.

(Barron Depo., Pl. Ex. O at 30.)

believed Mr. Williams was not qualified for the promotion, although she admits that she did not know what the minimum qualifications for the job were. (Montoya Depo., Pl. Ex. R at 7-9.) Ms. Montoya also testified that she felt Mr. Salazar wanted Mr. Williams to be the manager because they were good friends. *Id*. at 12. Celia Rael de Garcia's testimony that a few women had complained of gender discrimination by Mr. Williams is also irrelevant because it does not relate to Mr. Salazar. (Rael de Garcia Depo., Pl. Ex. S at 43-46.) Finally, Ms. Leyba also contends that "Mr. Salazar was biased against women and treated them as if they were beneath him," (Resp. at 14), citing to Susie Romero's deposition testimony that she thought no woman would ever be Communications Center Manager under Mr. Salazar and that Mr. Salazar was disrespectful to women. (Romero Depo., Pl. Ex. P. at 54-56.) This comment is obviously speculation.

Although Ms. Leyba also asserts that there has never been a female Communications Center Manager, this assertion rests on semantics rather than substance. When asked whether there had ever been a female Communications Center Manager, Mr. Salazar testified that a woman "ran the communication center for years prior to Bud Lake. She was there probably 15 years." (Salazar Depo., Ex. A. to Defendant's Reply at 61-62.) Although she did not have the title of "Communications Center Manager," Mr. Salazar testified that "the function was the same." *Id*. at 62.

In short, the evidence that Ms. Leyba claims establishes pretext on the basis of Mr. Salazar's gender bias is insufficient to create a genuine issue of material fact.

## 2. *Mr. Salazar knew Mr. Williams was not qualified*

The City contends that it followed its ordinary procedure in selecting a Communications Center Manager: the personnel department complies a list of qualified applications; the City holds

a group interview for each applicant; the interviewers vote to recommend an applicant for the position; the recommendation is provided to the department manager, who in this case was Mr. Salazar; the department manager makes the final selection, which must be approved by the City's personnel director and City manager. (Defendant's Memo. at 2.) A careful review of the evidence, however, casts doubt on the City's contention that it followed its ordinary hiring process in verifying Mr. Williams' minimum qualifications for the position of Communications Center Manager.

Mr. Salazar and Mr. Rodriguez both testified that the personnel department was responsible for checking the minimum qualifications of applicants applying for the position of Communications Center Manager. (Salazar Depo., Ex. F to Pl.'s Resp. at 165; Rodriguez Depo., Ex. C to Pl.'s Resp. at 13.) Mr. Rodriguez also testified that he was the person who checked the qualifications of applicants for the Communications Center Manager position. (Rodriguez Depo., Ex. C to Pl.'s Resp. at 13.) However, in an Answer to Plaintiff's Interrogatories, the Personnel Administrator, Gene Sandoval, stated that it was Mr. Salazar who was responsible for checking the minimum qualifications of applicants. (Salazar Depo., Ex. F to Pl.'s Resp. at 166.) Mr. Salazar also provided equivocal testimony stating that he contacted Mr. Williams' references "[t]o get a character reference for Thomas and to try and establish experience and any supervisory." (Salazar Depo., Ex. F to Pl.'s Resp. at 197.) Mr. Salazar then attempted to clarify his statement and testified, "when the issue came up, supervisory experience, that's when that was handled by my secretary. I don't remember which one of the secretaries or if it was Personnel that took care of that, I don't remember the details, but it was verified by one of us." (Salazar Depo., Ex. F to Pl.'s Resp. at 197.)

While I am mindful that I cannot substitute my business judgment for that of the City, *see, e.g., Branson*, 853 F.2d at 772 ("courts are not free to second-guess an employer's business judgment"), it is obvious that there is an inconsistency or contradiction in the City's proffered legitimate reason for promoting Mr. Williams that does not have to do with business judgment, but instead with the basic task of ensuring that an applicant has met the minimum qualifications for a promotion. Based on the contradictions between Mr. Salazar's testimony and the City's written discovery response regarding who was supposed to have verified Mr. Williams' minimum qualifications, a reasonable factfinder could rationally find that the City's proffered reason for promoting Mr. Williams is unworthy of belief. A rational factfinder might conclude that either no one had checked Mr. Williams' qualifications at all, so the City could not have even known whether he was qualified, or that Mr. Salazar was entrusted to verify Mr. Williams' qualifications but purposefully chose not to. *See Morgan,* 108 F.3d at 1323 (holding that a plaintiff may establish pretext by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and  hence infer that the employer did not act for the asserted non-discriminatory reasons.'") (citation omitted); *Simms*, 165 F.3d at 1328 (stating that evidence of pretext may include "disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria)").

Moreover, the City has not met its burden of establishing the absence of a genuine issue of material fact regarding whether Mr. Williams actually met the minimum job qualifications. Although I cannot decide for the City whether air traffic controller experience constitutes public safety experience, I note that Mr. Williams' own testimony about his supervisory experience as an

air traffic control coordinator raises doubts as to whether he actually had two years in a

supervisory capacity in public safety communications.   Mr. Williams acknowledged that as an air

traffic control coordinator he was not considered to be in a supervisory position and that he did

not write evaluations of other employees.  However, he testified that he had "supervisory

responsibilities."  (Williams Depo., Ex. J. to Pl.'s Resp. at 11-12; Ex. I to Defendant's Reply at 8-

9.)  When asked to describe these supervisory duties, Mr. Williams stated:

> The actual supervision okay, is when you're actually – you would
> rotate from position to position.  So, say, for instance, you start out
> your shift as the approach controller.  Okay, you had certain people
> who were rated controllers who were deemed qualified and capable
> of not only handling their position but being able to see everyone
> else's position.  So you would rotate every two hours or so.
>           So during the shift you would be in that position for maybe
> two hours, maybe four, perhaps the whole shift.  So it went from
> shift to shift.  The supervisory--so that was the supervisory
> capacity.

 (Williams Depo., Ex. I to Defendant's Reply at 9.)  Mr. Williams' testimony does not actually

state that he supervised other people.  Instead, he equivocally states that he was able "to see

everyone else's position."

The discrepancies in Mr. Williams' four applications to the City also raise troubling

questions about his actual supervisory experience.  In Mr. Williams' March 29, 1993, application

to the City for a position as Emergency Dispatcher Trainee, Mr. Williams left blank the space

inquiring about his supervisory experience in the Air Force.  (March 29, 1993, application, Ex. H

to Pl. Resp. to Defendant's Mo. for Summ. J. on Pl. Breach of Contract Claims; Salazar Depo.,

Ex. F to Pl. Resp. at 150.)  In his March 11, 1994, application to the City for a position as

Emergency Dispatcher, Mr. Williams again left blank the space asking about supervisory experience in the Air Force. (March 11, 1994, application, Ex. H to Pl. Resp. to Defendant's Mo. for Summ. J. on Pl. Breach of Contract Claims; Salazar Depo., Ex. F to Pl. Resp. at 151.) However, in Mr. Williams' third application to the City, which he signed and dated March 29, 1994, Mr. Williams stated that he had supervised five employees from June 1990 to October 1991. (Salazar Depo., Ex. F to Pl. Resp. at 153-54.) In Mr. Williams' fourth application to the City, he submitted a resume stating that he had responsibility for a shift of up to fifteen air traffic controllers in his position as Air Traffic Radar Approach Control Watch Supervisor. (Salazar Depo., Ex. F to Pl. Resp. at 157-58.) Although Mr. Salazar testified that he reviewed Mr. Williams' personnel file when Mr. Williams applied for the positions of temporary and permanent Communications Center Manager, Mr. Salazar claims that he did not notice these discrepancies. (Salazar Depo., Ex. F to Pl. Resp. at 154-55.)

Under this evidence there appears to be a genuine issue of material fact regarding whether Mr. Williams actually met the minimum requirement of two years in a supervisory capacity in public safety communications. *See Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391 (6th Cir. 1990) (holding that the district court erred in finding that the plaintiff failed to prove pretext when the defendant hired an applicant who did not meet the minimum qualifications stated in policy handbook and that the defendant changed the job qualifications after the application process began), *cert. denied*, 498 U.S. 1082 (1991).

Although Ms. Leyba's evidence of pretext is fairly minimal, I conclude that she has created a genuine issue of material fact regarding the pretextual nature of the City's proferred reason for promoting Mr. Williams. Therefore, Defendant's Motion for Summary Judgment on

Plaintiff's Claims of Discrimination should be denied.

**B.**    <u>**Defendant's Motion for Summary Judgment on Plaintiff's Claims for Retaliation**</u>

The City requests that I grant of summary judgment in its favor on Count II ("New Mexico Human Rights Act--Retaliation,"), Count IV ("Title VII--Retaliation,") and Count V ("Retaliation") of Ms. Leyba's Amended Complaint.

    *1.*    *Retaliation based on Mr. Williams' alleged treatment of Ms. Leyba*

In Counts II, IV, and V of Ms. Leyba's Amended Complaint, she alleges that Mr. Williams retaliated against her by generally belittling her and undermining her supervisory authority.  (Amended Complaint at Count II, ¶ 33; Count IV; and Count V, ¶ 52.)  In its supporting memorandum, the City argues that Ms. Leyba's retaliation claims based on Mr. Williams' alleged retaliatory treatment of Ms. Leyba should be dismissed on the ground that Mr. Williams' actions did not rise to the level of adverse employment actions.  *See Cole*, 43 F.3d at 1381 (to establish a prima facie case of retaliation, a plaintiff must show that she suffered an adverse employment action).  In her response, Ms. Leyba failed to respond to this argument.   Ms. Leyba's failure to do so constitutes consent to grant the City's motion regarding Mr. Williams' alleged retaliatory treatment.  *See* D.N.M.LR-Civ 7.5(b) (failure to file "a response in opposition to any motion constitutes consent to grant the motion"); *Gutierrez v. Deming Public Schools*, No. 95-2277, 1996 WL 364617 (10th Cir. 1996) (plaintiff's failure to respond to motion to dismiss justified dismissal of plaintiff's complaint).  Therefore, the City's Motion for Summary Judgment on Ms. Leyba's claims of retaliation arising from Mr. Williams' alleged treatment of her should be dismissed with prejudice.

## 2.    *Retaliation based on the City's failure to rehire Ms. Leyba*

Ms. Leyba argues that the City's refusal to rehire her for the position of emergency dispatcher in February 1996, September 1996,[5] and November 1996, constituted retaliation for having filed an EEOC complaint of discrimination.  The City contends that it refused to rehire Ms. Leyba for a legitimate nondiscriminatory reason--that Ms. Leyba had sent two letters to the City that were extremely critical of City management.  (Leyba June 22, 1995, letter, Ex. B to Defendant's Memo. and Leyba October 9, 1995, memo, Ex. C to Defendant's Memo.)  The City also argues that because Ms. Leyba has failed to create a genuine issue of fact regarding pretext,[6] summary judgment should be entered in the City's favor on Plaintiff's retaliation claim.    After reviewing the evidence, I conclude that Ms. Leyba has established a genuine issue of material fact regarding the City's refusal to rehire her in February 1996 and September 1996, but that summary judgment should be granted in favor of the City on Ms. Leyba's claim of retaliation regarding the City's refusal to rehire her in November 1996.

### a.    the City's refusal to rehire in February and September 1996

By the time the City received Ms. Leyba's February 1996 application, Assistant Director of Personnel, Arturo Rodriguez, and Mr. Salazar knew that Ms. Leyba had filed an EEOC complaint.  (Rodriguez Depo., Ex. C to Defendant's Reply at 109.)  According to Mr. Rodriguez,

---

[5] In Ms. Leyba's First Amended Complaint, she alleges that she applied to the City in August 1996 rather than September 1996.  However, in Ms. Leyba's Response, she asserts that she applied in September 1996 and cites to a  September 23, 1996, letter from the City.  (Sept. 23, 1996, letter from City, Ex. I to Pl. Resp.)  Therefore, I refer to Ms. Leyba's second application to the City for rehire as having occurred in September 1996.

[6] The City has not argued that Ms. Leyba failed to establish a prima facie case of retaliation regarding the City's failure to rehire her.  Ms. Leyba also concedes that the City has set forth a legitimate non-discriminatory reason for failing to rehire her.  (Resp. at 11.)

the City Attorney's office told him that the City was not required to rehire.  *Id.* at 107.   A brief

note from Mark Allen, Assistant City Attorney, to Vikki Gurule, states that the City was not

required to rehire Ms. Leyba.[7]  (Ex. K to Pl. Resp.)  Mr. Rodriguez testified that he spoke about

Ms. Leyba's application with Mr. Salazar, who said that he did not want to rehire Ms. Leyba

because it was not in the best interest of the department.  (Rodriguez Depo., Ex. C to Defendant's

Reply at 108; Ex. E to Pl. Resp. at 111.)  Mr. Williams testified that he told someone in the

personnel department, probably Mr. Rodriguez, that he thought Ms. Leyba could be rehired.

(Thomas Depo., Ex. C to Pl. Resp. at 213.)   Mr. Salazar testified that he does not remember

being consulted about Ms. Leyba's February 1996 application.  (Salazar Depo., Ex. F to Pl. Resp.

at 188.)  Gene Sandoval testified that Mr. Rodriguez told him that it would be a bad idea to rehire

Ms. Leyba because she had written a letter to Ms. Gutierrez stating that she was unable to work

with the current management at the Communication Center.[8]  (Sandoval Depo., Ex. F to

Defendant's Reply at 14.)  The City apparently never provided Ms. Leyba with a reason for

refusing to rehire her.

Regarding Ms. Leyba's September 1996 application, Mr. Rodriguez testified that Ms.

Salazar "just said no."  (Rodriguez Depo., Ex. E to Pl. Resp. at 110-11.)   Mr. Salazar, however,

---

[7] It appears that Mr. Allen may have told Mr. Rodriguez that it was reasonable for the City not to rehire Ms. Leyba because of her resignation letter.  (Allen Depo., Ex. B to Defendant's Reply at 19.)  However, Mr. Allen, also testified that he did not recall what Mr. Rodriguez told him was the actual reason for not rehiring Ms. Leyba and that he may have assumed that personnel declined to rehire Ms. Leyba because of her letter.  *Id.*

[8] It is unclear from the deposition excerpt attached to the City's Reply whether this discussion took place regarding the February, September, or November 1996 applications.  It appears however, that the discussion took place regarding Ms. Leyba's first application, which would be her February 1996 application.

denied that he knew Ms. Leyba had reapplied with the City for a second time or that the City had denied her second application. (Salazar Depo., Ex. F to Pl. Resp. at 189.)

Having carefully reviewed the evidence, I conclude that Ms. Leyba has come forward with evidence showing that there is a genuine issue of material fact regarding whether the City's proffered reason for refusing to hire Ms. Leyba in February 1996 and September 1996 was pretextual. According to Mr. Rodriguez, Mr. Salazar had the final authority to rehire Ms. Leyba because the department where someone is to be hired ultimately decides whether to hire an applicant, and Mr. Salazar was the director of MIS. (Rodriguez Depo., Ex. E to Pl. Resp. at 110-11.) According to Mr. Rodriguez, Mr. Salazar's only explanation for not wanting to rehire Ms. Leyba was the vague statement that it would not be good for the department. Mr. Salazar, however, testified that he does not remember discussing Ms. Leyba's first application with Mr. Rodriguez and that he never even knew that she had applied again in September 1996. There is obviously a contradiction between Mr. Rodriguez' testimony and Mr. Salazar's testimony. Additionally, there is a notable lack of evidence establishing that the reason the City denied Ms. Leyba's applications in February 1996 and September 1996 was because of the two letters she had sent to the City professing her inability to work with management. I therefore conclude that there are "weaknesses, implausibilities, inconsistencies, and incoherencies, [and] contradictions" in the City's proffered legitimate reason for refusing to rehire Ms. Leyba in February 1996 and September 1996 that would enable a reasonable jury to rationally find that the City's proffered legitimate reason for failing to rehire her was "unworthy of credence." *Morgan*, 108 F.3d at 1323.

### b.    November 1996 application

By November 1996, Bud Lake had replaced Mr. Williams as Communications Center Manager and Mr. Salazar was no longer working in emergency dispatch.  (Pl. Resp. at 7.)  Mr. Lake testified that he wanted to rehire Ms. Leyba.  (Lake Depo., Ex. A to Defendant's Reply at 33.)   After learning of her application, Mr. Lake testified that he contacted Mr. Allen at the City Attorney's office to ask whether he could rehire Ms. Leyba.  *Id*.  Mr. Allen told him that "he would prefer I not hire [Ms. Leyba] because she had written a memo at some point in time after I left, and so he would just prefer that she not be hired back."  *Id*. at 34.  From Mr. Lake's testimony, it appears that it was ultimately his decision alone not to interview Ms. Leyba, *id.* at 35-37, although he based this decision on Mr. Allen's comments about Ms. Leyba's resignation letters.  *Id*. at 37.

Mr. Allen testified that he told Mr. Lake, "'Have you seen her resignation letter?  You need to look at that resignation letter or memo . . . and you need to understand that personnel has a valid basis, or reasonable basis, for not wanting to hire her back.'"  (Allen Depo., Ex. B to Defendant's Reply at 18.)  Mr. Allen also testified that he foreclosed Mr. Lake's questions about Ms. Leyba having filed an EEOC complaint and specifically instructed Mr. Lake that he should not talk about that with the personnel department and that it was not a factor to be considered in deciding whether to rehire her.  *Id*.  Because Mr. Lake's and Mr. Allen's testimony are completely consistent on this issue, and because it appears that Mr. Lake was the one who decided not to interview or rehire Ms. Leyba, Ms. Leyba has failed to create a genuine issue of fact regarding the

City's legitimate nondiscriminatory reason for not rehiring her in November 1996.[9]  Therefore,

Defendant's Motion for Summary Judgment on Plaintiff's Claims for Retaliation should be

granted in part and denied in part.

---

[9] Ms. Leyba does not argue that pretext can be inferred by the mere fact that her two previous applications had been denied by the City.  Also, I note that there is no evidence that Mr. Lake actually read Ms. Leyba's resignation letters.  This fact does not preclude the grant of summary judgment in the City's favor, however, because it is clear from Mr. Lake's testimony that he decided not to interview Ms. Leyba based on Mr. Allen's concern over Ms. Leyba's resignation letters--not her EEOC complaint.

**C.** **Defendant's Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract**

In Counts VI and VII of Ms. Leyba's Amended Complaint, she avers that the City's policy and procedures manual constituted a written employment contract and that the City breached its contract with Ms. Leyba, and also breached the implied covenants of good faith and fair dealing, by failing to adhere to the grievance procedure set forth in the manual. In her Response, Ms. Leyba specifically argues that the City should have provided her with a grievance hearing after she wrote the April 26, 1995, memo to the Liz Gutierrez, the Administrative Services Director, and Victoria Gurule, the Personnel Director, stating, "[t]his grievance is filed as a result of the promotion of Thomas Williams to Communications Center Manager." Having reviewed the City's policy and procedures manual, I conclude that Ms. Leyba's breach of contract claims should be dismissed.

*1.      The Grievance Procedure*

Rule 8 of the City's policy and procedure manual states:

> 8.30    Definition.
>           A grievance may be considered as an expressed dissatisfaction, whereby an employee believes that he/she has been unfairly treated in violation of the City's Personnel Ordinance, or Rules and Regulations regarding personnel matters, or employment practice when property rights have been affected.
>
> 8.31    Rights.
>           A.      Grievances may not be filed under these Rules which allege discriminatory practices which would constitute a violation of the New Mexico Human Rights Act (§ 28-1-1 et seq., NMSA 1978). Allegations of these violations should be submitted to the New Mexico Human Rights Commission for

handling pursuant to the provisions of the Human
Rights Act.

   2.   *The Promotion is not a Property Right*

The City's policy and procedure manual apparently does not define what constitutes
"property rights" under Rule 8.31. Ms. Leyba argues that she has a property right in the
promotion she would have received had Mr. Williams not be permitted to interview because of his
lack of minimum qualifications. The City contends that Ms. Leyba had no property interest in a
prospective promotion, which is demonstrated by analogizing to Section 1983 case law holding
that a prospective promotion does not constitute a protected property interest for Fourteenth
Amendment purposes.

Property interests "are created and their dimensions are defined by existing rules or
understandings that stem from an independent source such as state law . . . ." *Bishop v. Wood*,
426 U.S. 341, 344 (1976). The parties have not cited to any New Mexico case holding that there
is a property interest in a prospective promotion. Both parties cite *Robb v. City of Philadelphia*,
733 F.2d 286 (3rd Cir. 1984) to support their respective positions. In that case, the Third Circuit
rejected the plaintiff's argument that he had a legitimate entitlement to promotion. *Id.* at 293.
The Third Circuit noted that the "civil service regulations indicate that promotion is neither a
matter of right nor may it be promised." *Id.* Instead, it "is based on successful completion of a
promotional examination" taking into account an applicant's qualifications, performance record,
seniority, and other factors. *Id.* Therefore, the Third Circuit concluded that the plaintiff could
not show entitlement to the promotion, which meant that the plaintiff had failed to demonstrate a
protected property interest that would support a Fourteenth Amendment due process claim

brought under Section 1983.  *Id.*

Here, applicants for the Communications Manager position had to satisfy minimum education and job requirements.  If they were determined to meet the minimum qualifications, then they were interviewed by a panel.  The panel's recommendation was forwarded to the Director of the MIS Department, who was Mr. Salazar.  He was free to select the panel's choice for the position or to disregard the panel's recommendation and choose his own applicant, provided that he did this in a non-discriminatory manner.  The personnel department and the Assistant City Manager also had to approve of the selected applicant.  (Rodriguez Depo., Ex. A to Def's Reply at 38-39.)  As Ms. Leyba argued regarding her discrimination claims, the interview panel only makes a *recommendation* to Mr. Salazar, who was free to ignore the panel's recommendation and select another applicant for the promotion.  Under these facts, Ms. Leyba had no protected property interest under the Fourteenth Amendment in receiving a promotion to Communications Center Manager based on the argument that, in hindsight, she would have received the promotion had Mr. Williams been disqualified because the interview panel had ranked her second.[10]  *See Ellison v. DeKalb County*, 511 S.E.2d 284, 286 (1999) (holding that plaintiff had no property interest under the Fourteenth Amendment in a promotion, which foreclosed plaintiff's argument that he was entitled to a hearing before being disqualified from consideration for the promotion, and stating that a "prospective promotion is not a property or liberty interest protected by the fourteenth amendment [or the Georgia Constitution].") (internal quotation and citation omitted), *cert. denied* (May 14, 1999); *Bielawski v. Personnel Adm'r of*

---

[10] Ms. Leyba does not argue that anyone at the City promised her the promotion or that she was in any other way led to believe she was entitled to the promotion.

24

*the Div. of Personnel Administration*, 663 N.E.2d 821, 827 (Mass. 1996) (rejecting plaintiff's claim that he had a "property interest in a promotion by virtue of his name appearing on the top of the certified list, his high score, or his expectations built up over years of long service" because each interest was "subject to qualification by the statutory scheme and none guarantees him a promotion at a certain date or upon a specific event."); *City Council of Laramie v. Kreiling*, 911 P.2d 1037, 1047 (Wyo. 1996) (surveying cases acknowledging the possibility of a property interest in a promotion, but stating that "a property interest does not exist when a promotion depends upon the discretion of a supervisor."). This conclusion compels the decision that Ms. Leyba had no property interest for purposes of filing a Rule 8.31 grievance under the City's policy and procedure manual.[11]

### 3. Ms. Leyba's grievance is really based on discrimination

Ms. Leyba does not dispute that the City's policy and procedure manual prohibits grievances based on discriminatory practices. (Resp. at 4.) Ms. Leyba also acknowledges that her claim under the grievance procedure was one for "unfair treatment," (Resp. at 8), which is underscored by the fact Ms. Leyba avers that the City violated the New Mexico Human Rights Act by denying her a promotion to Communications Center Manager because of her sex. (Amended Complaint, Count I.) Therefore, it is astonishing that Ms. Leyba now contends that she was entitled to file a grievance under the City's policy and procedure manual despite the fact she agrees that the City's policy and procedure manual *prohibits* the filing of grievances " which

---

[11] Ms. Leyba's breach of contract claims seem quite forced based on the facts that she has pled. The arguments she has made to support these claims seem better suited to a Section 1983 procedural due process claim, which she has not alleged, perhaps because she realized that a prospective promotion rarely constitutes a property interest warranting Fourteenth Amendment due process protection.

25

allege discriminatory practices which would constitute a violation of the New Mexico Human Rights Act (§ 28-1-1 et seq., NMSA 1978)." (Rule 8.31 of the City's policy and procedure manual.) Under the plain language of the City's policy and procedure manual, Ms. Leyba was prohibited from filing a grievance regarding Mr. Williams' promotion, which she alleged was a result of gender discrimination.

4.    *Damages are Speculative*

The final reason for granting the City's Motion for Summary Judgment on Plaintiff's Breach of Contract Claims is that Ms. Leyba's damages for not receiving a grievance hearing are entirely speculative. *See State Farm General Insurance Co. v. Clifton*, 86 N.M. 757, 758, 527 P.2d 798, 799 (1974) ("None of the claimed damages were the natural and foreseeable consequences of the claimed breach, and, thus were not within the contemplation of the parties."). Although Ms. Leyba would like to portray her breach of contract claim as based on the City's failure to promote her, her breach of contract claim is actually based on the City's failure to provide her with a grievance hearing. Even if Ms. Leyba had been afforded a grievance hearing, however, there is no guarantee that the City would have been convinced that Mr. Williams was not qualified, that he should be demoted from Communications Center Manager, and that Ms. Leyba should be promoted. Therefore, damages for any alleged breach of contract based on the City's failure to provide Ms. Leyba with a grievance procedure are entirely speculative.

IT IS THEREFORE ORDERED that:

1.      Defendant's Motion for Summary Judgment on Plaintiff's Claims for Discrimination (Doc. No. 79) is DENIED;

2.      Defendant's Motion for Summary Judgment on Plaintiff's Claims for Retaliation (Doc. No. 83) is GRANTED in part and DENIED in part; Defendant's Motion for Summary Judgment regarding Plaintiff's claims of retaliation arising from the Defendant's refusal to rehire her in February 1996 and September 1996 should be DENIED; Defendant's Motion for Summary Judgment regarding Plaintiff's claim for retaliation arising from the Defendant's failure to rehire her in November 1996 should be GRANTED, and this claim should be dismissed with prejudice; Defendant's Motion for Summary Judgment regarding Plaintiff's claim for retaliation arising from Mr. Williams' alleged treatment of Plaintiff should be GRANTED, and this claim should be dismissed with prejudice; and

3.      Defendant's Motion for Summary Judgment on Plaintiff's Claims for Breach of Contract (Doc. No. 68) should be GRANTED.


_____
UNITED STATES DISTRICT JUDGE